IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 04 CR 697 |
| | ) | |
| KEVIN HENDERSON, | ) | Judge Robert W. Gettleman |

## MEMORANDUM OPINION AND ORDER

Is a man's home truly his castle? Defendant Kevin Henderson wants to know.

On November 26, 2003, defendant and his wife, Patricia Henderson ("Patricia"), had what might politely be described as a domestic dispute.[1] When Chicago Police Officers arrived at their home at 7760 S. Troy at 8:40 a.m., Patricia was standing outside the house with a noticeable redness around her neck. She told the responding officers that defendant had choked her while they were both in the house, and when he heard her call 911 he threw her out of the house and locked the door. A short time later Patricia's son arrived with the key to the house, which she gave to the officers, telling them that defendant had weapons in the house and had a history of drug and gun arrests, and that she would sign a complaint. Although there is conflicting evidence as to whether Patricia told the officers at that time that she wanted the house searched, the court need not resolve that dispute.

In any event, the police used the key to unlock the front door and encountered defendant in his living room. Defendant told the police to "Get the fuck out of my house."[2] The police

---

[1]The following facts were established by the submissions of the parties, the arrest reports and case report prepared by the Chicago Police, and the testimony of the witnesses at the hearing on the government's motion to reconsider the granting of the motion to suppress.

[2]There is some controversy about whether defendant made this statement to the officers. The notes prepared by the United States Attorney prosecuting this case reflect that one or more

(continued...)

placed defendant under arrest for domestic battery, according to the police report at 8:53 a.m., and transferred him to the police station (again according to the police report) at 8:58 a.m. Before the officers searched the house, Patricia signed a written consent to search at 9:10 a.m. Officer Scumaci conducted a search of the attic at Patricia's suggestion, and found crack cocaine, drug paraphernalia including baggies and a digital scale, seven handguns and rifles (including a AR-15 automatic assault rifle) and live rounds of ammunition. In the basement, the officers discovered a crossbow, a machete, additional live rounds of ammunition, and an M-100 explosive device. At Patricia's suggestion, and based upon a written consent to search that she signed at 9:35 a.m., the officers thereafter searched the family car, finding two more bags of crack cocaine.

Defendant, who has a prior felony record, was originally charged by the state authorities, but was ultimately charged with the federal offenses of possessing with intent to distribute the narcotics in violation of 21 U.S.C. 841(a)(1), and with being a felon in possession of weapons, in violation of 18 U.S.C. 924(c) and 922 and 26 U.S.C. § 586(d).

Defendant filed a motion to suppress the evidence seized by the Chicago Police Officers based primarily on the recent Supreme Court case of Georgia v. Randolph, __ U.S. ____, 126 S.Ct. 1515 (2006), in which the Court held that a warrantless search of a home based on the consent of a co-inhabitant of the home was invalid where another co-inhabitant who was

---

²(...continued)
of the arresting officers confirmed that defendant told them to "get the fuck out of my house." At the suppression hearing, however, the officers testified either that they did not recall defendant making the statement or that he did not make such a statement. Based on the candid and professional representation of the prosecutor, the court finds that defendant in fact made the statement.

physically present expressly refused consent to search. Specifically, the Court held "that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." Id. at 1526. Based on the written submissions of the parties, this court granted the motion to suppress in light of the Randolph decision, holding that the search in question was not incident to defendant's arrest, but was clearly evidentiary in nature. Patricia's consent could not could not justify a warrantless search of the home. The court reserved ruling on whether the evidence obtained through the search of the car would be suppressed.

At a later status hearing, the government informed the court that it was seeking approval from the Solicitor General to file an interlocutory appeal of the court's ruling on the suppression motion. Shortly thereafter, the government filed a motion to reconsider, arguing that because Patricia's consent was given after defendant was legitimately removed from the scene of the residence, the facts of this case distinguished it from Randolph and compelled denial of the motion to suppress. Because the police reports that the parties had relied on were unclear as to when Patricia gave her initial consent to search the home, the court set the matter for an evidentiary hearing.

While the motion to suppress was being briefed, the United States Court of Appeals for the Sixth Circuit issued its opinion in United States v. Hudspeth, 459 F.3d 922 (August 25, 2006), in which the defendant, who was not present at his residence, refused consent to search the residence. The police went to the home and obtained a voluntary consent to search by the defendant's spouse, and proceeded to discover incriminating evidence of child pornography on

the defendant's home computer. The Eighth Circuit held that, although <u>Randolph</u> does not directly address the situation in which a co-tenant who refuses consent is not physically present at the search, "the same constitutional principles underlying the Supreme Court's concerns in <u>Randolph</u> apply regardless of whether the non-consenting co-tenant is physically present at the residence, outside the residence in a car, or, as in our case, off-site at his place of employment. We believe that the Supreme Court has made it clear that the police must get a warrant when one co-occupant denies consent to search." <u>Id</u>. at 922. The court also noted in passing that "to some degree, the case for respecting the denial of consent by a non-present occupant is stronger than the refusal of the physically-present occupant," because a physical presence might require the police to enter a dwelling to protect a non-consenting spouse.[3] <u>Id</u>.

In the instant case, this court finds the reasoning of the Eighth Circuit in <u>Hudspeth</u> to be persuasive. Indeed, the facts are even stronger for defendant than for Mr. Hudspeth. Defendant was physically present in his own home when he refused consent to the police. His rather indelicate instruction for them to leave his home surely included a direction that they not only depart but refrain from searching the residence. Having been denied permission to search defendant's home, under the teaching of <u>Randolph</u> and <u>Hudspeth</u> the police acted unreasonably by conducting a search based upon the later consent of the co-tenant, Patricia, after defendant had been removed from the premises.

In its final brief, the government attempts to distinguish <u>Hudspeth</u>, but in doing so merely reenforces the conclusion that the search of defendant's home was unreasonable. First, the

---

[3]Because of other factors not relevant to the instant case, the <u>Hudspeth</u> court did not direct the granting of the motion to suppress, but remanded the case for further proceedings.

4

government argues that unlike Hudspeth, in which the police failed to advise the defendant's wife of his refusal to consent to search, "that is not the case here . . .." But there is no indication in the instant record that Patricia was informed of defendant's statement, and the Hudspeth court did not base its rationale on any deception by the officers.

Second, the government argues that the computer search in Hudspeth "is qualitatively a great deal more intrusive than the brief search of defendants home." The reasoning flies in the face of established Supreme Court precedent holding that the home is entitled to heightened Fourth Amendment Protection. "[I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people." Minnesota v. Carter, 525 U.S. 83, 89 (1998) (Kennedy, J. concurring). This was not a search incident to defendant's arrest, but took place well after defendant had been removed from the scene, and included areas (the attic and basement) remote from the place of arrest (the living room).

Finally the government argues that there were "dangerous circumstances" in the instant case because defendant "stood a good chance of bonding out and returning to the house where his weapons were stored and his wife, the victim of a recent physical beating, was living." This is pure speculation; defendant had been arrested and transported to the police station for booking. The officers had more than ample time to apply for a warrant and to keep the house secured until they obtained one. See Illinois v. McArthur, 531 U.S. 326 (2001).

The court reaches a different conclusion with respect to the search of the family car. There is no indication in the record that defendant denied consent to search the vehicle at or after the time he was arrested. In the absence of such denial of consent, the police were perfectly entitled to search the car based on Patricia's express consent to do so.

For the foregoing reasons, the court denies the government's motion to reconsider, reaffirms its decision to suppress the evidence seized in defendant's home, and denies defendant's motion to suppress the evidence seized in the car.

**ENTER: November 29, 2005**

_____
**Robert W. Gettleman
United States District Judge**